IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| REGIONS MORTGAGE, INC., | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 04-AR-0003-S |
| | } | |
| OVERBY-SEAWELL COMPANY, | } | |
| | } | |
| Defendant. | } | |
| | } | |
| _____ | } | |
| | } | |
| OVERBY-SEAWELL COMPANY, | } | |
| | } | |
| Third-party Plaintiff, | } | |
| | } | |
| v. | } | |
| | } | |
| VESTA INSURANCE CORPORATION, | } | |
| et al., | } | |
| | } | |
| Third-party Defendants. | } | |

**MEMORANDUM OPINION**

The complicated and diverse issues hereinafter discussed may explain, if not excuse, the time that has elapsed between the date this court took under submission four motions for summary judgment in the above entitled case and the issuance of this opinion. Before the court for too long are Rule 56 motions, one by each of the four parties. Plaintiff, Regions Mortgage, Inc. ("Regions"), seeks summary judgment against defendant, Overby-Seawell Company ("OSC"). OSC, in turn, seeks summary judgment against Regions. Finally, both third-party defendants, Vesta Insurance Corporation ("Vesta") and Cason Financial Corporation

("Cason") seek summary judgment against OSC on its third-party action against them.

## Facts[1]

On January 1, 1993, OSC entered into an agency agreement with Liberty National Fire Insurance Company (now known, and hereinafter referred to as Vesta). The agreement provided that OSC was to act as Vesta's agent in "marketing and processing" its Mortgage Security Program ("MSP") to banks. As part of this agreement, OSC agreed to "comply with applicable laws and regulations of each state... in which it shall operate as representative" for Vesta. The parties agreed to indemnify one another for "misconduct." The MSP was so-called "force place" insurance, or collateral protection insurance. Collateral protection insurance ensures that the collateral a lending institution takes to secure a mortgage is covered if the mortgagor allows his insurance coverage to lapse, or if insurance does not otherwise cover the collateral. Many financial institutions demand collateral protection insurance, and some are paid fees in connection with the program.

OSC, Cason and First Commercial Mortgage ("FCM"), entered

---

[1]Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant.  *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir. 1993).  In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

into an agreement on September 1, 1993 under which OSC and Cason

would provide FCM with Vesta's MSP insurance program. Neither

FCM, nor Regions, drafted the agreement.[2] The agreement specified

in part:

> Each party will make known to all other parties any
> knowledge obtained or learned during the term of this
> agreement of any law or regulation affecting the
> insurance placed or administration of the force place
> program. Upon notification, each party agrees to make
> any changes necessary to comply with such law or
> regulation within thirty days.

Additionally, the parties agreed, as follows, to indemnify one

another:

> VI. Indemnifcation. In performing their respective
> duties and obligations under this agreement, CFC, OSC
> and FCM each agree to indemnify, defend, and hold
> harmless the other against any and all claims losses,
> damages, demands, judgments, penalties, fines,
> deficiencies, causes of action or expenses of any
> nature (including reasonable attorney's fees) resulting
> from (a) any act, error, or omission committed by
> either party of its agent and employees to observe and
> comply with all laws, regulations, bulletins and
> governmental orders applicable to the activities being
> performed by each. The foregoing indemnification shall
> apply whether or not the allegations for which
> indemnification is sought are groundless or the party
> against whom such allegations are made is adjudged not
> guilty.

According to OSC, FCM required commission payments from

Cason and OSC as a condition of doing business with it. Letters

from OSC and Cason to Vesta indicate that they, rather than FCM,

---

[2]It is entirely unclear who drafted the agreement. Larry Overby, the
principal of Overby-Seawell suggests that Cason was responsible for drafting
the agreement. No party suggests that FCM played any part in drafting the
agreement.

may have originally proposed the idea of reimbursements or commissions. After doing some research, Cason determined that it would be legitimate to pay FCM a commission because it had an affiliated insurance company, and it initially paid twenty-five percent of the premiums collected as commission. FCM's wholly owned and affiliated insurance agency could receive commissions where FCM itself could not.

FCM subsequently agreed to use Vesta (via OSC and Cason) as its provider of collateral protection insurance. Vesta determined the premium rate per one hundred dollars of collateral, and had that rate approved by the Arkansas Department of Insurance (the relevant state insurance regulator). Vesta was responsible for resetting the rates and obtaining the approval of those rates with the appropriate state insurance department throughout the course of the business relationship. OSC was not involved in the calculation or determination of Vesta's premium rate.

OSC claims that it had no role in determining the amount of coverage required for each mortgagor. FCM instructed OSC on what amount of coverage to seek on a given property. Regions also informed OSC as to when it should begin and terminate coverage.

In 1995, Cason discovered that FCM no longer had an affiliated insurance agency. Officials from Cason and OSC discussed the problem, and concluded that the payments to FCM should be handled as expense reimbursements. First Commercial,

predecessor to Regions, indicated that it was amenable to such a plan, and another agreement was executed in 1996, including the same indemnification and compliance with laws and regulations language quoted extensively earlier in this opinion. This new agreement was made retroactive to the original signing in 1993. While the deal was now structured as expense reimbursement, OSC continued to pay twenty-five percent of the premiums to FCM, just as it had before. According to OSC officials, FCM assured OSC, perhaps through Cason, that its expenses easily exceeded the twenty-five percent of the premiums it received. No one knows who drafted this new agreement that is governed by Alabama law.

Around August 1, 1998, First Commercial merged with Regions. Regions acquired all of FCM's liabilities and assets at that time. Regions never required expense reimbursement, and the payments from OSC ceased at that time. Over the life of the program, FCM collected approximately three million dollars in payments.

This case arises out of Regions' settlement of a California class action, *Beverly J. Grant v. Regions Mortgage Company, et al* (hereinafter, the "*Grant* litigation"). Beverly Grant filed suit on behalf of a class of similarly situated borrowers against Regions and Vesta alleging breach of contract, violation of

California Business and Professions Code §17200[3], conversion and unjust enrichment. Grant claimed, *inter alia*, that the premiums charged under the MSP exceeded the replacement costs of the collateral; that there were improper charges for expense reimbursement; and that some of the coverage was not necessary, either to protect FCM's interest or because the mortgagors insurance had yet to lapse. OSC was not a party to the *Grant* litigation.  Around February 7, 2002, the *Grant* litigation was settled in mediation. As part of the settlement, Regions agreed to pay $ 349,479. In defending the suit, Regions also incurred attorney's fees in the amount of $354,232.26.

Regions and OSC acknowledge that at the time of settlement Grant's class claim was more limited than what she charged in her original complaint. Essentially, at that point, Grant only alleged that it was improper for FCM to have received reimbursement of any portion of the insurance premium.  Further, there was never any assertion by the *Grant* plaintiffs that the *premium rate* was unlawful.

At mediation of the *Grant* litigation, Regions claimed its reimbursements were based on measurable tasks, and were not tied to the amount of premium collected. Regions still contends that all of the payments were reimbursements for specific expenses,

---

[3] This is the California Unfair Competition Statute which declares "unfair competition" unlawful. Cal. Bus. & Prof. Code § 17200. "Unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising..." *Id*.

but no one from Regions has specified how those reimbursements were calculated, or in fact, if there is any documentation of the claimed expenses.

Counsel for Regions contacted OSC and demanded that OSC pay fifty percent of any settlement Regions agreed to in the *Grant* litigation. OSC responded with a request for the opportunity to attend and participate in the mediation. It did not agree to pay anything. Regions did not allow any OSC representative to attend the mediation. The case was settled for over three hundred thousand dollars. Regions here claims that it incurred over three hundred thousand dollars in costs and attorneys's fees in defending the *Grant* action, and that it is indemnified by OSC for those damages.

## **Analysis**

### I

OSC argues that it never agreed to indemnify Regions, and that Regions therefore cannot succeed to the rights of FCM under the agreement. Its argument is essentially that Regions has no standing to enforce the indemnification agreement. OSC notes that its principal, Larry Overby, testifies that he did not intend the indemnity clause to benefit any successor in interest of FCM. This argument is unavailing. What he may have thought is irrelevant and cannot change the terms of the contract. When FCM merged into Regions, all of its rights and obligations were

7

inherited by the new company. *See* Ala. Code § 10-2B-11.06(a)(1) - (a)(2) (1975). Alabama case law supports the notion that the rights and obligations of a predecessor corporation transfer to the successor corporation. *See generally Sevier Ins. Agency v. Willis Corroon Corp. of Birmingham*, 711 So.2d 995, 1000 (1998).

OSC responds by citing *Pyle v. Pizitz*, 110 So.2d 822 (Ala. 1926), which holds that an indemnification agreement "cannot be extended to losses or damages neither expressly with its terms, nor of such character that it can reasonably be inferred that the parties intended to covenant against them.". This argument fails because all of the losses which Regions claims are indemnified were caused by conduct which occurred before FCM merged into Regions.[4] It is not fair to say that the losses for which indemnity is claimed were outside the terms of the contract just because Regions subsequently merged with FCM. OSC suggests, with no evidence, that its potential exposure was enlarged "immeasurably" when FCM merged into Regions. All merger can arguably increase (or decrease) the particular risk so contracts should be drafted as to anticipate this possibility.  All of the losses for which indemnity is here claimed were a result of the

---

[4]Regions cut off the expense reimbursement plan when FCM merged into it. All of the damages to the plaintiffs in the *Grant* litigation due to the expense reimbursement plan were the result of conduct occurring before Regions entered the picture. Thus, OSC cannot come back and claim that these losses are not "within the terms of the contract" nor can it not " reasonably be inferred that the parties intended covenant against them" merely because Regions merger with FCM. The FCM/Regions merger did not in fact increase the scope of OSC's liability, and thus, the contract is not somehow void on those grounds.

agreements between OSC, FCM, Cason, and Vesta. The court can find
no Alabama law that indicates that a merger, alone, without
evidence of actually broadening the scope of liability the
agreement makes the original agreement a nullity. Essentially,
all that Regions asks for in this case is indemnity for the
damages resulting during the period in which FCM was in business
with OSC. That Regions is the entity entitled to collect any
indemnification owed to FCM does not increase the exposure of OSC
because of the *Grant* litigation, but even if it did Regions is
entitled to OSC's exposure to FCM. The contract is enforceable
and FCM's merger with Regions does not change that fact.[5]

II

The remaining issues in both Regions and OSC's motions for
summary judgment center around whether the indemnification
agreement is enforceable. Indemnification is an issue of state
law, as are issues of contractual interpretation and enforcement.
*See, e.g.*, *Royal Ins. Co. of America v. Whitaker Contracting
Corp.*, 295 F.3d 1381 (11th Cir. 2002). The indemnification
agreement in question here is governed by Alabama law (the

---

[5]Further, as was noted by Regions, OSC is likely estopped from arguing
rescission or that the contract is void by the equitable principles of waiver
and estoppel. OSC continued to perform under the contract after FCM merged
with Regions until 2000. "[G]rounds for rescission may be waived by party in
whose favor the basis for rescission exists." *Alabama Tailoring Co. v.
Judkins*, 88 So. 865, 867 (Ala. 1921). Even if rescission was available or the
contract was voidable, OSC's continued performance, and acceptance of
performance after it learned FCM had merged with Regions amounts to waiver of
those defenses. OSC's response that it was not required to give Regions notice
of rescission is inapposite, as OSC continued to perform under the contract,
as well as, accept performance.

contract states that it is "made pursuant to and shall be construed and governed by the laws of the State of Alabama"). This court is therefore bound to apply the law of Alabama as the Alabama Supreme Court would apply it. *See, e.g. Towne Realty, Inc. v. Safeco. Ins. Co.*, 854 1264, n.5 (11th Cir. 1988).

Under Alabama law, indemnification agreements are enforceable. *Industrial Tile, Inc. v. Stewart*, 388 So.2d 171, 176 (1980). In that case the Alabama Supreme Court stated:

> if the parties knowingly and, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity for the indemnitee's own wrongs, if expressed in clear and unequivocal language, then such agreements will be upheld.

*Id.*

The Eleventh Circuit has also found this to be a correct statement of Alabama law. *See Royal Ins. Co.* at 1041-3 (specifically noting the *Industrial Tile* holding as indicative of Alabama law on the subject).[6]

In determining whether to enforce an agreement indemnifying a party against liability arising from its own actions, Alabama law requires a court to look to three factors: (1) the

---

[6]Regions relies to a much greater extent on *General Television Arts, Inc. v. Souther Railway Co.*, for the Eleventh Circuit's adoption of the *Industrial Title* rule as indicative of Alabama law. 725 F.2d 1327 (11th Cir. 1984). However, this case makes that holding only in footnoted *dicta*. Further, *GTA* is a highly distinguishable decision, a fact that will be made clear at a more relevant occasion in this opinion. On the other hand, in *Royal Ins. Co.* the Eleventh Circuit does make specific findings of Alabama law before deciding to certify its question to the Alabama Supreme Court.

"contractual language"; (2) the "identity of the draftsman of the language"; and, (3) "the indemnitiees retention of control." *Brown Mech. Contractors, Inc. v. Centennial Ins. Co.*, 431 So.2d 932, 945 (Ala. 1983); *Royal Ins. Co.*, 242 F.3d at 1042. The court will take each of these factors in turn.

Regions depends upon its insistence that the language of this agreement allows it to recover indemnity for its own acts. An agreement by A to indemnify B for B's own conduct is enforceable only if the indemnity provisions are "clear and unequivocal" to that effect. *Industrial Tile*, 388 So.2d at 176. Special clarity or talismanic language is not required, but **the intent of the parties must be clear**. *See Brown*, 431 So.2d at 946. The court agrees with Regions that the meaning and intent of the parties comes through even though the language is imperfect. It is plain that each party has agreed that it will indemnify the other parties for **all** losses or damages incurred as a result of **its own** act, error or omission. If Regions can prove that its damages were a result of an act, error, or omission of OSC, it is no doubt entitled to indemnity from OSC.

If this is all the agreement means, the result is unremarkable, even with regard to *Industrial Tile* and its progeny. These cases appear to apply *only* where the agreement provides for indemnity for the indemnitee's error, act or omission. These cases, primarily *GTA*, deal with language so

11

different from the language in the case at bar that it is worth pointing out what the agreements in those cases actually say so the court can accurately depict what the agreement here does not say. The cases cited (*GTA*, *Industrial Tile*, etc.) all point to some language which indicates an intent that "all risk of loss" is transferred to one party or the other. *See, e.g. Greater Television Arts*, 725 F.2d at 1329 ("it being understood and agreed that ***all risk of loss***, damage, injury and death shall be and is hereby assumed by [GTA] and said [GTA] shall and will protect, indemnify, defend and hold harmless Southern Railway from and against all claims for such loss")(emphasis added); *City of Montgomery v. JYD Int'l, Inc.*, 534 So.2d 592, 593 (Ala.1988)(agreement stating that "Lessor shall be responsible for any damages or injury... from any cause whatsoever, ... and the said Lessee hereby expressly releases said Lessor from, and agrees to indemnify it against any and all claims for such loss, damage or injury"); *Industrial Tile*, 388 So. 2d at 176 (the indemnity provision provides that the contractor is "***solely responsible*** to indemnify and hold harmless the owner... from and against ***any and all claims***... arising out of or occurring in connection with the performance of the work to be done pursuant to the contract and ***whether or not caused by*** or contributed to...the active, passive, affirmative, sole or concurrent negligence or breach of any statutory duty, whether non-delegable

12

or otherwise **on the part of the owner**...")(emphasis added).
These cases are notable because the courts found that the
agreement's language was "clear and unequivocal" in manifesting
an intention to indemnify a party even for its own negligence or
wrongdoing. All of the cases clearly, whether or not they use the
catch phrase, intend to shift "all risk of loss" involved in the
agreement to one party.[7] These are the types of agreements that
courts find contain "clear and unequivocal" language evincing an
intent to indemnify regardless of which party's action resulted
in the damages.

     No such language exists in this case. While it might
possibly have been the intention of the parties to force one
party or the other to absorb "all risk of loss," it is impossible
to divine that intent from the text of the agreement. A careful
look at the contract language itself makes the difference plain:
"[Cason], OSC and FCM **each agree** to indemnify, defend and hold
harmless **the other** against any and all claims" (emphasis added).
Unlike contracts where risk was shifted primarily, or entirely,

---

[7]Cason and OSC each cite the court to two Fifth Circuit cases which
stand for the proposition that "circular" indemnification agreements are
unenforceable. *See Moore v. Southwestern Electric Power Co.*, 737 F.2d 496 (5th
Cir. 1984); *Babcock v. Continental Oil Co.*, 792 F.2d 1346 (5th Cir. 1986). The
court reads these persuasive authorities, and despite the fact that they are
on a slightly different point of law, finds them to agree with the general
approach the court is taking. Because the agreement here does not shift "all
risk of loss," to one party in particular, any attempt to indemnify without
regard to which party's act or omission caused the damages would either be
circular, with each party suing the others over and over again; or, one where
the last party sued for indemnification would be left holding the bag. Because
of that absurd result, and in order to keep from finding the entire
indemnification clause unenforceable, the court takes the narrower reading.

to one party to the agreement, here **each** party has agreed to indemnify the other parties. There is no transfer of risk of loss to one party here, and loss is equally apportioned to each of parties based on some factor (presumably fault). Thus, to the extent Regions is trying to argue this contract is broad enough to encompass "all risk of loss," it fails to persuade the court that such a meaning or intent is "clear and unequivocal." Either way the court can essentially stop and not pursue the other two factors of the *Brown Mech.* test.[8]

If Regions only wishes to be indemnified for damages and losses incurred as a result of OSC's error, act or omission in failing to apprise it of changes in the law, the remainder of the test is unnecessary because *Industrial Tile*, and its progeny are mostly irrelevant.  However, if Regions wishes to be indemnified for damages resulting entirely from its own acts, omissions, it cannot succeed because the agreement is not "clear and unequivocal" in shifting such a risk to OSC or Cason. Therefore,

---

[8]As to the second *Brown* factor, there appears to be no substantive charge that Regions or FCM drafted the agreement. At least one party has claimed that Cason is responsible for drafting the agreement. Regardless, it remains unclear who drafted the agreement. Therefore, at this time the court cannot construe the agreement against any party. Because the agreement appears clear on its face, which party to construe the agreement against seems unlikely to present an issue of *material* fact.

As to the third factor, it is difficult to say which party, or parties, were "in control" of the commission portion of the force place program. Both OSC and Regions seemingly had some role to play in the program. In light of the substantive claim here, that OSC did not inform FCM that taking payments for the insurance program above "identifiable" expenses was likely illegal, it seems that OSC exercised at least some degree of control over the continuing legality of the program. However, given that this question treads heavily upon which party's act, or omission was responsible for the damages, it will be taken up again later in this opinion.

the only way Regions can recover under the contract is to prove
that all its losses or damages were "resulting from" OSC's "act,
error, or omission."[9]

### III

Given the narrower interpretation of Regions' contention,
OSC and Cason argue that the agreement is actually for
"contribution" rather than "indemnification." This argument is
misplaced. "As a general rule under Alabama law, there is no
right of indemnity or contribution among joint tortfeasors."
*Kennedy Engine Co. v. Dog River Marina & Boatworks, Inc.*, 432
So.2d 1214, 1215 (Ala. 1983). Both OSC and Cason cite a plethora
of Alabama cases for just such a proposition, and the court
cannot help but be persuaded that such is the law of Alabama.
However, the present case is so clearly distinguishable from the
so-called "general" situation that the court wonders why OSC and
Cason have invested so much effort in this argument. All of the
cases cited discuss the right, if any, in cases brought *ex
delecto*, of a party to recover contribution, or full indemnity,
from a joint tortfeasor. There is no such right in Alabama.
However, in the instant case the recovery for indemnification (or
contribution, if the entire sum is not sought) is sought in the
law of contract or *ex contractu*. The parties agreed to indemnify

---

[9]If this was Region's only claim all along, then the court apologizes
for pursuing this issue at such length. However, the attorneys, through their
citations and argument, certainly gave the court the impression that Regions
was seeking an "all risk of loss" type reading.

each other under certain circumstances, and the right of contribution in tort is in no way implicated in this case. Thus, these cases in no way call into question the enforceability of the agreement, and are inapposite. The question remains whether, and under what circumstances, Regions may recover under the agreement. Perhaps the court's failure to appreciate and respond at length to this argument hints at a lack of "sophistication."[10]

IV

The question of which party's "act, error or omission" resulted in the damages and loss incurred by Regions leaves the court with issues of material fact. As best the court can tell, the primary "act, error or omission" Regions complains resulted in its damages was OSC's failure to notify Regions of potential liability associated with the MSP program. Regions points out that OSC's attorney, Joseph Justice, analyzed the risks of the MSP program in 1997 for OSC. Mr. Justice noted that "it is my

---

[10] In its response to Regions's reply to its motion for summary judgment, OSC suggests the power of its "contribution" argument by noting, "that one of the most sophisticated law firms in the Southeastern United States was unable to present an argument more sophisticated than 'We're not seeking contribution because we have styled our claim as one for indemnification, rather than contribution' speaks volumes for the unavoidable conclusion that Regions bank is, in reality, seeking contribution." Responding at length to arguments which are clearly unrelated to the ultimate disposition of the case is not always the "sophisticated" thing to do. Without getting in to the many problems with OSC's argument, the court chooses to note that its reading of the law and understanding of the facts of this case, as well as the meaning of the legal terms used, puts it squarely at the same level of sophistication as counsel from "one of the most of sophisticated law firms in the Southeastern United States." So all sides can take that for whatever it is worth.

understanding that some lending institutions are reluctant to receive 'commission' related to MSP programs because they are not licensed to lawfully receive such commissions." Mr. Justice continued, discussing the question of whether the payments by OSC to FCM would be any better if not "commission," but rather covering expenses, " a rose is a rose is a rose, and the validity of such a claim is not diminished by the label you attach to the payment." Finally, Mr. Justice concluded:

> Based upon the desires and instructions of the various parties as set forth herein, the safest course f action would be to pay nothing to the bank. The next safest position would be to pay to reimburse only specific, identifiable expenses. But in no event should OSC allow itself to put in a position where any or all of hte parties later look to it as the culprit if the reimbursement program fails to pass judicial or regulatory muster. To avoid this, all parties, including CFC, should be apprised of OSC's concerns and position.

Regions contends that OSC was obligated to reveal this information as a result of the agreement's requirement that "each party will make known to all other parties any knowledge obtained or learned during the term of this agreement of any law or regulation affecting the insurance placed or administration of the forced place program." It is undisputed that OSC did not inform FCM of the revelation of its attorney that the MSP program was likely in violation of the law, regardless of whether the payments were "commission" or covering "expenses," and that certainly OSC should only reimburse "specific, identifiable

expenses." Therefore, it is clear that this was an omission by OSC to comply with its obligation to inform FCM of any law affecting the administration of the forced placement program. Did Regions damages *result* from this omission?

Judging by the plaintiffs' mediation statement in *Grant*, the question of the legality of the expense reimbursement program was the critical issue presented to the mediator during settlement negotiations.[11] The basis of the settlement, and therefore the damages, is logically traceable to OSC's failure to inform FCM/Regions of its knowledge of the relevant legal conditions.

However, this was not the only possible act or omission from which the damages may have resulted. OSC claims that, regardless of any failure on its part to warn FCM of the legal ramifications of expense reimbursements, FCM demanded reimbursement payments of the same percentage as its "commission" and ignored calls to itemize its expenses. The court reads these allegations in two

---

[11] For instance, Ms. Grant, discussing the common issues of law that predominate the class of plaintiffs, argues "[e]ither the practice of receiving expense reimbursements is legal or it is not." The entire mediation statement is laced with references to the expense reimbursement portion of the MSP program. OSC agrees with this interpretation in its brief in support of its motion for summary judgment, "at the time Regions Mortgage, Inc. settled the Grant action, Ms. Grant's claim was more limited than set forth in her First Amended Complaint, and she was alleging only that it was improper for First Commercial to have received a portion of any insurance premium paid." This is precisely what the legal knowledge of OSC would have revealed, and thus, OSC admits this connection between the settlement and its failure to notify FCM of legal problems. It cannot now hide behind a claim that the settlement covered other portions of the original *Grant* action.
   Additionally, this entire exchange makes clear that whether or not OSC designed and calculated the rate structure is irrelevant. Regardless, it is clear that OSC did not design or calculate the rate, and cannot be forced to indemnify on that ground.

ways: (1) as an argument of causation, suggesting that the damages were the result of FCM's own acts and errors, and that any legal warning by OSC would not have altered the outcome; and (2) as an invocation of the equitable defense of "unclean hands."

In order to recover for a breach of contract, a plaintiff must prove: (1) the existence of a valid contract between plaintiff and defendant;(2) his own performance under the contract; (3) the defendant's breach or failure to perform; and (4) damages which resulted from defendant's breach or non-performance. *See, e.g.*, *Shelton v. Clements*, 834 So.2d 775, 782 (Ala. Civ. App. 2002). The court does not find serious argument about the first three elements of the claim.[12] However, the fourth element of the breach closely tracks the triggering portion of the agreement's indemnity clause which requires parties to indemnify against "any and all claims, **losses, damages**.... or any expenses of any nature (including reasonable attorney's fees) **resulting from (a) any act, error, or omission committed by either party**." The indemnity clause is somewhat duplicative of the fourth element of a breach of contract, in

---

[12]OSC does claim that Regions/FCM breached the contract, and thus, that element three is not met. Essentially, OSC claims that Regions breached the contract because it did not keep thorough records of for the reimbursement schedule. How this amounts to a breach of the contract is somewhat unclear, but OSC invokes the clause of the contract which requires parties to "make any changes necessary to comply with such law or regulation within thirty days." At best, OSC's argument is an argument that there is an issue of material fact on the question of whether FCM/Regions performed under the contract, which precludes it from getting summary judgment. It is a bizarre argument without any evidence **proving** a breach by FCM.

that under both that element and the word of the indemnity agreementthe damages or losses must result from the act or omission of OSC.

OSC is claiming, if somewhat vaguely, that the damages incurred by Regions "resulted from" FCM's own acts and omissions, at least to some extent, and not exclusively from the omission of OSC.

The court agrees that Regions' own actions likely contributed to its losses and damages. In fact, it is probably impossible to attribute all of Regions' damages and losses by the settlement of the *Grant* action to OSC. OSC only learned of the potential legal problems related to the MSP program in 1997. However, FCM had been without an affiliated insurance agency for over a year at the time of Mr. Justice's memo to OSC. This begs the question to what extent damages had accrued even before OSC had the opportunity (the revelation of the legal opinion of its attorney) to breach the contract. Further, the evidence leaves the impression that FCM  might have continued to seek reimbursements even if OSC had informed it of the potential liability associated with the program. The risk of continuing the payments after FCM no longer had an affiliated insurance agency (of which FCM was aware, because the agreement was rewritten) may have indicated FCM's insistence on such payments regardless of legal risk. All of these are questions of fact that remain

unresolved in the state of the evidence. At the summary judgment
stage, this court cannot judge the relative levels of causation.
Because the parties have not provided the court with a standard,
in this context, which suggests that "results from" means results
exclusively from, the court is left to say that judgment as a
matter of law is inappropriate because issues of material fact
remain.

Likewise, OSC's "unclean hands" defense cannot provide a
basis for complete summary judgment against Regions' claims. The
"unclean hands" defense applies "to deny relief to a plaintiff
who has himself acted improperly, i.e. with 'unclean hands' in
regard to the very transaction as to which he is seeking the aid
of equity, the conscience of the court" *Friendly Credit Union v.
Campbell,* 579 So.2d 1288, 1291 (Ala. 1991). In light of this
principle, it would appear that any improper behavior by FCM in
regard to the MSP program transaction, and specifically, the
reimbursement payment program would bar any **equitable** relief to
FCM. That is all well and good, but it is unclear what equitable
relief is being sought by Regions. "Unclean hands" applies only
to equitable relief. To the extent that Regions seeks an
equitable remedy this defense is valid, and summary judgment must
be granted.[13] However, the primary relief sought by Regions seems

---

[13]The complaint does contain a count asking for "equitable indemnity,"
which is an equitable remedy. However, from the summary judgment materials it
appears that while Regions has specifically not given up such a count, it has
all but abandoned it at summary judgment. Based on the defense of unclean

to be in law, rather than equity.[14] Therefore, summary judgment
of Regions' entire claim is not appropriate on the basis of
"unclean hands," and the court moves on to OSC's last two
defenses.

V

OSC argues that summary judgment is appropriate because of
judicial estoppel. Judicial estoppel is designed to prevent a
party from taking a position in one litigation that is contrary
to, or inconsistent with, a position taken in a prior case. For
judicial estoppel to apply, the court being asked to apply it
must be satisfied that: (1) a party's position is clearly
inconsistent with its earlier position; (2) the party was
successful in the earlier proceeding so that judicial acceptance
of the inconsistent position indicates that the first court was
misled[15]; and, (3) the party seeking to assert the inconsistent

----

hands, summary judgment of this count, if it still exists, is appropriate.

[14]Whether the relief sought by Regions is in law or equity seems to be a
semantical question in this case. It is possible to construe Regions claim as
one for specific performance of the indemnity clause of the contract,
requiring OSC to pay the full amount of damages. However, it is just as easy
to style the case as one for damages at law, with damages of the same amount
as those paid if it were based on specific performance. Neither side has
chosen to make any argument related to this question, although OSC assures the
court that "unclean hands" should bar Regions' claims. Regardless, because
Regions styled its prayer for relief as, "plaintiff prays for judgment against
Overby-Seawell in an amount to be determined by a struck jury, including
compensatory damages, interest, costs and attorneys' fees," rather than as a
claim for specific performance, the court is obliged to take it as a claim at
law for damages without convincing argument from OSC.

[15] The U.S. Supreme Court noted that if the party was not successful in
the first suit on the basis of its original position, then "a party's later
inconsistent position introduces no risk of inconsistent court positions and
therefore poses little threat to judicial integrity."*New Hampshire v. Maine,*
532 U.S. 742, 750-1 (2001)(internal citations omitted).

position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Ex parte First Alabama Bank,* 883 So. 2d 1236, 1244-45 (Ala. 2003); *see also New Hampshire v. Maine,* 532 U.S. 742, 750-1 (2001). The ultimate purpose of the doctrine of judicial estoppel is to protect the "integrity of the judicial process." *Id.* at 750.

Getting straight to most obvious problem with this argument in this case, OSC claims that Regions was "successful" in the *Grant* action because it settled the case based on the position that the payments it received were not wrongful. Without some case law to the contrary, this court finds it impossible to believe that a three hundred thousand dollar plus settlement amounts to "success." There was no judgment rendered in favor of Regions. The position taken by Regions was that the payments it received were not wrongful. "Success," based on that position, would seem to entail Regions making no payment to the *Grant* plaintiffs. Paying money to the class plaintiffs when its position was that its actions were not wrongful and that plaintiffs were entitled to nothing hardly seems like success. Further, given that the integrity of the courts is the critical issue at stake, it is questionable whether the position taken in settlement negotiations would rise to the level necessary to impugn the integrity of the court system if the position there taken by Regions does not estop it. Because OSC has presented no

realistic argument that Regions actually succeeded in its position that its receipt of payments were not wrongful, judicial estoppel is not warranted in this case.[16]

VI

OSC finally argues that summary judgment is warranted because Regions never made a demand for indemnification prior to settling the *Grant* action, and because it barred OSC from participating in the settlement negotiations. The general rule in Alabama requires the indemnitee to provide notice of the original suit or settlement before seeking indemnification from the indemnitor. *Stone Building Co. v. Star Elec. Contractors, Inc.*, 796 So.2d 1076, 1090 (Ala. 2000). If the indemnitee does not provide notice, or a request for indemnification before reaching a settlement, the indemnitee has the burden of proving that it was actually liable and that the settlement was a reasonable one. *Id.* "If the indemnitor has been given notice of the action against the indemnitee and has been given an opportunity to defend or to settle the action, then the indemnitor is precluded from contesting the indemnitee's liability in a subsequent indemnity or third-party action." *Id.* (internal quotations omitted).

Unfortunately for OSC there is at best a question of

---

[16]It is not at all clear that OSC could even prove the other two elements necessary for judicial estoppel in Alabama. However, the court stops here because OSC so clearly fails to meet the "success" element.

material fact as to whether or not Regions asked for
indemnification before the settlement of the *Grant* action. OSC
admits that Regions informed it of the pendency of the *Grant*
action. Regions further states that it asked for indemnity long
before the case was settled. OSC claims that Regions merely asked
for "contribution," while threatening to "bring third-party
claims." In fact, in its reply brief, OSC even admits that these
"threats" of third-party actions were styled as "a claim for
indemnification." It appears, then, that Regions did adequately
ask for indemnification prior to settling the *Grant* action.

However, OSC also complains that it did not have an
opportunity to "defend or to settle" the *Grant* action because
Regions barred it from the settlement negotiations. There is no
dispute that OSC was not allowed to participate in the settlement
discussions. Because OSC was not allowed to settle or defend the
action, it would ultimately be forced to indemnify Regions on
terms Regions negotiated, and without any opportunity to
interpose defenses or determine if a more reasonable settlement
could be had. As OSC sees it, Regions should be forced to prove
that the "settlement was a reasonable one" including that Regions
was actually liable for the damages it paid. Regions had a duty
to allow OSC to participate, in some capacity, in light of *Stone*.
The extent to which this duty was met in the pre-settlement
discussions between Regions and OSC is an issue of material fact

25

here. If Regions made clear that OSC would be allowed to participate if it agreed to indemnify, and/or not to disrupt the settlement agreement, perhaps that would be enough to have given it a meaningful "opportunity" to defend or settle the case. Regions does not dispute that it kept OSC from attending settlement negotiations. If Regions truly settled the *Grant* action without giving OSC any opportunity to opt into the settlement Regions must in fact prove actual liability and the reasonableness of the settlement of that liability.

The agreement in this case, unlike *Stone*, did not require actual liability on the part of the indemnitee (here, Regions), but required indemnity even if the charges were "groundless" or the party was "adjudged not guilty." Regions argues that this clause removes the need for it to prove actual liability. The court disagrees. OSC argues that "this is a distinction without a difference" in terms of the need to notify and allow OSC to participate. The court agrees. This clause did not directly abrogate Regions' duty to notify OSC of the *Grant* action. In fact, the contract from the *Stone* case is not incredibly dissimilar to the language employed in this case. The doctrine requiring prospective indemnitees to afford prospective indemnitors the opportunity to defend or settle a case for which they may ultimately be responsible runs separately, and distinctly from any contractual duty. Even despite the

"groundless" language of the agreement, Regions still had a duty to OSC to allow it to participate in the settlement of a case it may subsequently have to pay for.

Assuming there is no question of fact as regards whether the level of discourse between Regions and OSC amounted to an opportunity to "settle or defend," summary judgment is not appropriate because there are questions of material fact as to whether or not Regions was "actually liable" and the settlement was "reasonable." OSC provides deposition testimony suggesting that Regions argued it was not liable at the mediation of the *Grant* action, and that it cannot prove that it was liable because it does not have the requisite documentation to establish that it, in fact, received more than its expenses from the program and, thus, was actually liable. The court has heard a thousand lawyers argue that their clients are not liable then settled the case. This argument is just another offer to the court to take up OSC's judicial estoppel defense, which the court again declines. The latter suggestion apparently tells the court that it is OSC's opinion that Regions cannot prove actual liability. However, giving all reasonable inferences to the non-movant, Regions, the court finds an issue of material fact, even assuming that Regions in fact has no evidence of expenses incurred from the MSP program. It seems imminently reasonable to infer that the reason Regions has no documentation for the expenses of FCM is that FCM

27

was in fact just taking a flat percentage of the premiums without regard to its expenses, which may or may not at all times have exceeded the reimbursement rate. A reasonable jury could indulge logical inferences and find that even without direct evidence of its liability Regions was "actually liable" in the *Grant* action and the settlement was "reasonable." Because these issues of fact exist, summary judgment on the question of participation in settlement and actual liability would be improper.

Therefore, all of the claims of Regions and defenses of OSC considered, summary judgment for either side on Regions claim in this case is inappropriate, except as to the availability of Regions' equitable indemnity claim.

The court does not intend to visit or revisit the issues of contract interpretation, as well as certain defenses mounted by OSC that are clearly untenable.

VI

Cason's motion for summary judgment is due to be denied. Cason's arguments, for the most part, boil to a re-recitation of the arguments OSC mounted in its defense against Regions' claims under the contract. Cason, like OSC, argues that it did not participate in any conduct that caused damages and therefore triggered the indemnification provision. However, there is at least a material question of fact in that regard after reading OSC's similar defense to Regions' claim. Regions claims that OSC

28

owes indemnification to it because OSC failed to notify FCM of
the legal consequences of paying reimbursement discovered by
OSC's attorney, Mr. Justice. The court has allowed Regions to go
forward on that theory earlier in this opinion. OSC, in its
defense, notes that it revealed the legal opinion of Mr. Justice
to Cason and expected Cason to inform FCM. OSC claims it gave the
opinion letter to Cason, and told it to inform Regions, which OSC
claims was the ordinary custom because the accounts belonged to
Cason. The court agrees with OSC that the deposition testimony of
Larry Overby establishes at least a question of material fact as
to which party was ultimately responsible for failing to inform
FCM of the potential legal exposure resulting from its taking
reimbursement payments as a percentage of premiums. Cason's role
in the case appears critical, because FCM and OSC apparently both
relied on Cason to keep them informed of much of the goings on of
the other. For example, OSC claims that Cason was the party who
went to FCM to determine if its costs were truly above the level
of the twenty-five percent reimbursements, not OSC. OSC relied on
Cason's assertion that FCM was in fact generating more
reimbursable costs than the reimbursement covered. All of this
further clouds the question of which party, or parties, is
responsible for the losses and damages incurred by Regions. If
the failure to provide Regions with the critical legal knowledge
was the cause of its damages, then there is a question of

material fact as to whether OSC or Cason, or both, dropped the ball. Cason's motion for summary judgment will therefore be denied.

VII

OSC's claim against Vesta is based on the indemnification provision of its agency agreement with Vesta, because Vesta was not a party to the indemnification agreement which forms the basis of Regions' claims. The agreement with Vesta reads, in relevant part: "[Vesta] shall be liable to Overby-Seawell for any judgments or penalties assessed against Overby-Seawell for misconduct of [Vesta]'s employees, agents or appointees." The plain meaning of this clause suggests that Vesta only has to indemnify OSC for (1) judgments against it; which arise out of (2) misconduct by Vesta.

There are two issues that lead to summary disposition in favor of Vesta. First, OSC can show no relevant "misconduct" by Vesta. Vesta set the underlying premium rates of the insurance policies at issue in the *Grant* litigation. Vesta was not in any way involved in the commission/reimbursement structure. OSC provides no evidence whatsoever of "misconduct" by Vesta. Vesta designed and calculated the premium rates, but no actual misconduct in the design or calculation of the rates is alleged by either OSC, or by Regions. The premium rates were cleared by the Arkansas Department of Insurance, and were always within the

30

rates approved by that department. OSC has failed to produce even a shred of evidence of misconduct by Vesta. Without some evidence of misconduct OSC cannot go forward on its third-party action against Vesta.

Second, the basis of the settlement of the *Grant* action was Ms. Grant's claim of expense reimbursement above costs and not any claim of excessive premiums. Nothing, other than a reference by Regions in its first amended complaint to OSC's design and calculation of the rates, indicates that the premium structure is actually at issue here, or was at issue in the *Grant* action. Thus, even if judgment against OSC is entered based on the *Grant* action, because that action was not based in any way on the premium structure, any misconduct in computing the premiums by Vesta would not be the subject of any indemnification collected by Regions. There is no nexus between the *Grant* action and any supposed conduct by Vesta. Because the settlement of the *Grant* action did not involve any claim that the premium rate was improper or inflated, OSC cannot possibly have a cause of action against Vesta for any damages it incurs in the main action against Regions. Summary judgment is appropriate on OSC's claim against Vesta, and Vesta will be eliminated as a third-party defendant.

31

Conclusion

A separate order implementing the above opinion will be entered.

DONE this __20th____ day of May, 2005.


_____

WILLIAM M. ACKER, JR.

UNITED STATES DISTRICT JUDGE